THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
JAMES J. MANCINELLI, Defendant-Appellant.

Fifth District   No. 5—90—0856

Opinion filed July 21, 1992.

212

Daniel M. Kirwan and E. Joyce Randolph, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Henry Bergman, State's Attorney, of Carlyle, and William Tarsa, of Chicago (Norbert Goetten and Stephen E. Norris, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WILLIAM A. LEWIS delivered the opinion of the court:

Defendant appeals from convictions by a Clinton County jury for reckless homicide (Ill. Rev. Stat. 1987, ch. 38, par. 9—3) and failure to reduce speed to avoid an accident (Ill. Rev. Stat. 1987, ch. 95½, par. 11—601).

On September 29, 1989, defendant and his brother, William Mancinelli, drove their motorcycles from Centralia, Illinois, to Bartelso, Illinois, to attend a computer club meeting. Upon arriving, they purchased a six pack of beer from a tavern across the street. They each drank three beers while working on computer programs over the next three hours. At approximately 10 p.m., they left to go home. They were traveling east on Illinois Route 161, when defendant stopped to light a cigarette at the junction of Illinois Route 127 and Illinois Route 161. The victim continued by himself.

Defendant admitted at trial, which occurred more than a year after the accident, he had "chased after" his brother and he "was probably running 65 miles per hour, 70 miles per hour to catch up with him; but there was nothing else on the road." Defendant was unsure of his speed because his speedometer was broken.

On the evening of the accident, the night was clear, visibility was good, the pavement was dry and there was some light from an outdoor light near a farmhouse. There was a "slight curve" in the road approximately two miles from where defendant stopped to light a cigarette. The road straightened after the bend, but a traveler could see through the bend and down the straight stretch.

Defendant testified that, after going through the curve and entering the straight stretch, he decided to pass his brother. For some reason, he felt his brother was too close to the center line to pass on the left, so he decided to pass on the right by slowing and swinging his bike to the right in the same lane. No reason was given why the defendant simply did not cross into the westbound lane and pass his brother safely. Defendant stated that his brother must have slowed or hit his brake, so that as he started to swing behind his brother to position himself to come up even with his brother on the right side, he had to jerk his motorcycle to the right to avoid hitting his brother. Defendant then pulled back to avoid hitting the side of the road, which caused him to be "slung back" to the left into his brother's motorcycle. The motorcycles became locked together and they had slowed "to 40, 45 miles per hour" as they proceeded down the road. Defendant claims that he "hollered" at his brother to break the cycles apart. He then pushed his handlebars, presumably away from the other cycle, and sped up for the purpose of separating the cycles. Defendant lost control because one of his risers, which controls the steering, apparently was broken in the collision. Defendant skidded off the road into a slight drainage ditch and came to rest at the foot of a white, upright tractor tire that was used with another tire to mark the driveway to the farmhouse. Defendant's brother went into a skid on the highway and later died from the injuries received.

Defendant admitted to telling different stories the night of the incident. He thought that he had told Trooper Patterson that he was doing 200 miles per hour, because his wife told him he had said that to the trooper. He told the people at Barnes Hospital in St. Louis that he had hit a pedestrian. He believed that he had told a woman who lived at the farmhouse at the site of the accident that he was doing 100 miles per hour and that his brother had stopped for him to catch up. Defendant admitted to being agitated at Trooper Patterson and

yelling for his brother in the hospital, but he said he did so because he was concerned about his brother, and because he had suffered severe injuries including a broken nose, broken wrist, cracked ribs and a broken foot.

Anita Newkirk, a nurse at the hospital, testified that defendant told her the night of the incident that he was going in excess of 90 to 100 miles per hour. She testified as follows regarding what defendant told her:

> "And then when he, he couldn't see him, he couldn't see him anywhere. Then he said he just come up right on top of him. He said he saw no taillights, he didn't see anything. He was just right there and he hit him and then slid into the grass."

Trooper Patterson recalled the defendant saying that night that he was traveling 90 to 95 miles per hour and that his brother had stopped on the roadway.

State Trooper James Hall was allowed to testify as a reconstruction expert only as to the speed of the motorcycles. He testified that the gouges on the highway in the eastbound lane, which were approximately 885 feet from the curve, were 11 feet and 1 inch along the pavement to the shoulder. Skid and plow marks on the grass continued for another 186 feet 6 inches to the white, upright tractor tire where defendant's motorcycle came to rest. The victim's motorcycle skidded 58.42 feet along the highway. The trooper used a minimum drag factor for concrete and assumed 100% efficiency in braking by both motorcycles in determining their speed. He used a minimum drag factor for grass for the slide of defendant's motorcycle, even though defendant's motorcycle, after having been hauled for storage, was still caked with dirt and grass. The trooper testified that the defendant was traveling a minimum of 75 miles per hour at the place where the gouge marks started on the highway. The victim, according to the trooper, was traveling 28 to 33 miles per hour from the point where the victim's motorcycle fell on its side and slid on the highway.

Both Patterson and Newkirk testified that the defendant was extremely intoxicated because he had a strong odor of alcohol, bloodshot eyes, and slurred speech and laughed at times and then cried at times. When asked to give blood for a test, he said, "Let's just say I am incapacitated." Defendant testified that his slurred speech was caused by a hole in his mouth, but the State's Attorney called the jury's attention to defendant's testimony and speech ability and asked it to be the judge of whether defendant slurred his words due to his prior injury.

Prior to the accident, defendant's speedometer was broken, and the header was held on by clamps. As a result of the accident, his motorcycle sustained damage starting at the left front wheel and continuing along the side, the fairing, and the handle bar. The victim's motorcycle was damaged on the right side, starting at the rear wheel and extending along the right side.

Defendant raises three issues on appeal: (1) he was not proven guilty beyond a reasonable doubt, because the State failed to prove that William Mancinelli's death was due to recklessness, as opposed to accident; (2) Trooper James Hall's testimony as an accident reconstructionist was inadmissible because defendant's testimony was clear and did not require additional explanation from an expert witness; and (3) his conviction and sentence for failure to reduce speed to avoid an accident was void because it was based on the same act as the offense of reckless homicide.

We affirm the trial court.

In order to sustain a conviction of reckless homicide, the State must prove beyond a reasonable doubt: "(1) that the individual was operating a motor vehicle; (2) that the individual unintentionally caused a death while operating the vehicle; and (3) that the acts which caused the death were performed recklessly so as to create a likelihood of death or great bodily harm to some person. (Ill. Rev. Stat. 1987, ch. 38, par. 9—3(a); *People v. Bodoh* (1990), 200 Ill. App. 3d 415, 429[, 558 N.E.2d 178].)" (*People v. Wilson* (1991), 143 Ill. 2d 236, 245, 572 N.E. 2d 937, 941.) Additionally, recklessness is defined by statute as follows: "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk \*\*\*; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." (Ill. Rev. Stat. 1987, ch. 38, par. 4—6.) Whether recklessness has been proved is an issue for the trier of fact to decide. *People v. Hawn* (1981), 99 Ill. App. 3d 334, 425 N.E.2d 1024.

> "The critical inquiry on a review of the sufficiency of the evidence to support a criminal conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Young* (1989), 128 Ill. 2d 1, 49,[ 538 N.E.2d 461, 472,] citing *Jackson v. Virginia* (1979), 443 U.S. 307, 318-19, 61 L. Ed. 2d 560, 573-74, 99 S. Ct. 2781, 2788-89.) A reviewing court may not reverse a conviction unless the evidence was 'so unreasonable, improbable, or so unsatisfactory as to justify entertaining a reasonable

doubt of the defendant's guilt.' *Young*, 128 Ill. 2d at 52[ ,538 N.E.2d at 474]." *Wilson*, 143 Ill. 2d at 246-47, 572 N.E.2d at 942.

Defendant argues that his "version of the events is at least as credible, if not more so, as the scenario sketched by the prosecutor." It is not the function of this court to decide which version is more credible, but rather to view the evidence most favorably for the State and then decide if such "evidence was so unreasonable, improbable, or so unsatisfactory as to justify entertaining a reasonable doubt of the defendant's guilt." *Wilson*, 143 Ill. 2d at 246-47, 572 N.E.2d at 942.

■ In reviewing defendant's testimony, we must keep in mind that the jury was aware that defendant had more than a year to rationalize his acts that resulted in the death of his brother. Defendant tried to convince the jury that his motorcycle somehow became locked together with his brother's motorcycle, and that they were traveling down the road at approximately 40 to 45 miles per hour. He even claimed that he had time to yell at his brother to break the bikes apart and to perform certain leaning acts before the bikes separated. His brother's bike, however, skidded on its side only 58.42 feet on the pavement, while defendant's bike skidded on its side 11 feet 1 inch on pavement and plowed 186 feet 6 inches through grass and dirt. (The photograph of defendant's motorcycle introduced as an exhibit showed the rear wheel, rear axle, rear fender, kick stand and footrest caked with dirt and grass even after it was hauled from the scene and placed in storage.) Even assuming that defendant increased his speed in an effort to break the motorcycles apart and that his brother braked, the jury could easily find that defendant's version was not possible or true because of the large disparity in the distances that the motorcycles skidded and the greater drag that grass and dirt would have on defendant's motorcycle as it plowed to where it came to rest at the tractor tire. The jury resolves factual disputes, assesses witness credibility, and determines the weight and sufficiency of the evidence. *People v. Batson* (1986), 144 Ill. App. 3d 1027, 1035, 495 N.E. 2d 154, 160.

■ The State did not have to prove the exact way the accident happened as long as the State proved that defendant operated his vehicle recklessly and in a manner likely to cause death or great bodily harm. (*People v. Boyle* (1979), 78 Ill. App. 3d 791, 396 N.E.2d 1347.) The jury could have believed the various witnesses' testimony that on the night of the incident defendant said his brother was stopped or going slow, and he was traveling 90 to 100 miles per hour when he hit his brother. The jury could also have reasonably believed part of

defendant's testimony at the trial when he testified that he changed his mind about passing his brother on the left and decided to pass him on the right side in the same lane. However, the jury could have reasonably believed from the evidence of the distances the motorcycles skidded, defendant's admissions, and the testimony of the reconstruction expert, defendant must have been traveling 75 to 100 miles per hour when he hit his brother and that the motorcycles did not become locked together. This version would explain the damage to the left side of defendant's motorcycle and the damage to the right side of his brother's motorcycle. It is after all the function of the trier of fact to determine the inferences to be drawn from the evidence. *People v. Bernotas* (1991), 215 Ill. App. 3d 371, 574 N.E.2d 1236.

Defendant cites *People v. Ziegler* (1979), 78 Ill. App. 3d 490, 396 N.E.2d 1160, for the proposition that speed by itself does not establish that he was reckless. The *Ziegler* court stated, however, that "as a theoretical matter that statement of the law is correct." (*Ziegler*, 78 Ill. App. 3d at 496, 396 N.E.2d at 1165.) But it has also been held that "a combination of excessive speed and other circumstances which would indicate a conscious disregard of a substantial risk likely to cause death or great bodily harm to others, and the circumstances are such that a reasonable person would act differently under the same situation" can be sufficient to convict of reckless homicide. (*People v. Bonzi* (1978), 65 Ill. App. 3d 927, 931-32, 382 N.E.2d 1300, 1303.) The case law is instructive as to when "other circumstances" are sufficient when combined with excessive speed to show recklessness. In *People v. Boyle* (1979), 78 Ill. App. 3d 791, 396 N.E.2d 1347, the court held that excessive speed and the failure to keep a proper lookout were sufficient to prove defendant guilty beyond a reasonable doubt. In *People v. Batson* (1986), 144 Ill. App. 3d 1027, 495 N.E.2d 154, the fact that the defendant backed her car at a high rate of speed, knowing that the victim was in close proximity to her car, was sufficient to show recklessness. Finally, in *People v. Mikyska* (1989), 179 Ill. App. 3d 795, 802, 534 N.E.2d 1348, 1352-53, the court held that "considering defendant's excessive speed, his attempt to avoid the accident by braking within 44 feet of decedent's car constitutes a gross deviation from the standard of care that a reasonable person would exercise in such a situation." When there is *excessive* speed on the part of a defendant in a nonemergency situation that causes the death of another person, it is unlikely there would not be other circumstances sufficient to show that the defendant consciously disregarded a substantial and unjustifiable risk, and that such disregard was a gross de-

viation from the standard of care which a reasonable person would have exercised in the same situation.

Defendant cites *People v. Walljasper* (1981), 97 Ill. App. 3d 81, 422 N.E.2d 251, as an example of a bad judgment call as opposed to recklessness. In *Walljasper*, however, there was no evidence that the defendant was operating his vehicle improperly when he hit an unexpected slick spot on the road that had also caused another car to spin out of control just prior to his accident.

The evidence that defendant was operating a motorcycle, which was not in perfect condition, at *night*, 75 to 100 miles per hour while trying to smoke a cigarette may be, in and of itself, "a gross deviation from the standard of care which a reasonable person would exercise in the situation." (Ill. Rev. Stat. 1987, ch. 38, par. 4—6.) When considered with the further evidence that defendant tried to pass his brother on the right in the same lane of traffic, we have an even greater deviation from the standard of care a reasonable person would have exercised. The jury could reasonably have inferred from the evidence that defendant was going to "zoom" by his brother's right side in the same lane.

Defendant stated that he had changed his mind about passing the victim on the left and was trying to pull over to the right of the victim so that he could cruise with the victim, which was how they usually traveled. Any maneuvers in the same lane of traffic, even assuming such to be legal, must be done with extreme caution and with the awareness of both parties. In any event, we do not have to decide if defendant's version of the facts without the excessive speed would be sufficient to constitute a gross deviation from the standard of care which a reasonable person would have exercised in that situation, because the jury apparently did not believe the defendant as evidenced by the conviction of defendant for failure to reduce speed to avoid an accident.

Defendant argues that the trial court erred in allowing a reconstruction expert to testify, because the defendant's eyewitness testimony as to his speed and what occurred was clear and required no further explanation from an expert.

The trial judge was confronted with the problem that, if he refused to allow the reconstruction expert's testimony, then the defendant could elect not to testify. Defense counsel even offered to allow the State to reopen its case to call the reconstruction expert if defendant failed to testify. The trial judge could not know in considering a motion *in limine* what the testimony of the defendant would be prior to trial, so the trial judge compromised by refusing to allow the

expert to give any opinion as to where and how the collision occurred, if defendant testified. The trial judge's ruling further limited Trooper Hall's testimony so that he was not allowed to testify as to whether the collision slowed the speed of defendant's motorcycle, whether the victim's motorcycle was moving when it was hit by defendant, or whether defendant's motorcycle was moving and, if so, at what speed, when it hit the white, upright tractor tire. The trial judge only allowed the expert to give his opinion concerning the speed of the vehicles based solely on the skid and gouge marks.

Justice Charles Chapman of this court wrote a learned opinion on the history and treatment of reconstruction experts by the courts in *Augenstein v. Pulley* (1989), 191 Ill. App. 3d 664, 547 N.E.2d 1345. There is no reason why the following rules, enunciated in *Augenstein*, should not apply to criminal cases.

"We hold, therefore, that the admissibility of reconstruction evidence is to be determined upon the rules announced by the supreme court for opinion evidence. Is the expert qualified in the field, and will his testimony aid the fact finder in the resolution of the dispute? *** The presence or absence of eyewitnesses thus becomes not the sole criterion for the determination of admissibility of reconstruction testimony, but only one of the criteria, and it obviously applies only to the second of the questions dealing with the admissibility of the testimony." *Augenstein*, 191 Ill. App. 3d at 681, 547 N.E.2d at 1356.

■ Defendant did not raise any question as to the qualification of the State's expert, Trooper James Hall. We are concerned, therefore, solely with the question of whether his testimony would aid the fact finder in deciding whether defendant's acts were reckless. The expert's opinions were, however, so severely limited by the trial court's ruling that it is difficult to describe him as a reconstructionist. We are left with simply an opinion that defendant's motorcycle had to be traveling at least 75 miles per hour in order to slide on its side 11 feet 1 inch on pavement and 186 feet 6 inches through grass.

The jury heard the testimony of the expert and considered it in conjunction with the photographs of defendant's motorcycle that showed the dirt and grass that had accumulated on the wheel, kick stand, and chain as a result of the cycle plowing through the grass and dirt. Further, the jury heard both Patterson and Hall testify that Patterson took Hall to the scene two weeks later and that the gouge marks of where defendant's motorcycle had plowed through the grass were still visible. The jury could reasonably conclude that defendant was traveling at a high rate of speed after the collision, but the ex-

pert's testimony that the minimum speed defendant was traveling was at least 20 miles per hour faster than the speed limit could be of assistance to the fact finder in determining whether defendant's conduct was reckless.

Defendant's testimony as to his speed was also only his opinion since his speedometer was broken. He also gave contradictory statements as to his speed and the speed of his brother's motorcycle. Finally, it would be a sad state of affairs if a defendant's testimony must be accepted without question as to what occurred when the defendant is the only survivor or eyewitness. There was, therefore, no reliable eyewitness as to the speed of the motorcycles. See *People v. McDermott* (1985), 141 Ill. App. 3d 996, 490 N.E.2d 1293 (defendant gave his opinion of his speed, but the court held that an accident reconstruction expert could testify due to lack of reliable eyewitness testimony).

■ Defendant next objects to his conviction and sentence for failure to reduce speed to avoid an accident, because it is allegedly based on the same act as the offense of reckless homicide. This court decided in *People v. Foster* (1988), 176 Ill. App. 3d 406, 531 N.E.2d 93, that failure to reduce speed to avoid an accident was not a lesser-included offense of reckless driving. That same reasoning applies to reckless homicide and failure to reduce speed to avoid an accident. Defendant states that he is not basing his argument on a "lesser-included" offense theory, but rather, he is raising the "one act, one crime" rule espoused in *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838. The supreme court in *King*, however, stated:

> "We hold, therefore, that when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." *King*, 66 Ill. 2d at 566, 363 N.E.2d at 845.

Accordingly, the convictions of defendant by the trial court for reckless homicide and failure to reduce speed to avoid an accident are affirmed.

Affirmed.

HARRISON and WELCH, JJ., concur.